A. HAMILTON & CO. v. ALEX. KENNEDY, et als.

WAREHOUSEMAN. *Services not enuring to benefit of true owner of property in storage. Claim for.* Cotton had been seized as captured and abandoned property, and removed by a special agent of the United States Treasury, and stored with the complainants, and several parties claiming the property as not abandoned, the special agent filed his bill of interpleader in the United States Circuit Court, under which the cotton was sold, and proceeds held subject to further order of the Court; upon bill filed by the warehouseman to impound this fund to pay their claim for charges upon the cotton; *held*, that the possession of the special agent up to the filing of his bill of interpleader was justifiable, and the charges properly accruing to that date were a lien upon the cotton. But all charges accruing after that date do not constitute a lien, as they have not enured to the benefit of the true owners, who

A. Hamilton & Co. *v.* Allen Kennedy, *et als.*

were all the time insisting upon the restoration of their property. The bailee, or warehouseman, can stand in no higher attitude than the party under whom he holds.

Cases cited: 3 Parsons on Con., 268; 2 Wend., 275; Mrs. Alexander's cotton, 2 Wall., 404; United States *v* Paddleford, 9 Wall., 531.

FROM DAVIDSON.

Appeal from the Chancery Court. JNO. P. STEELE, Chancellor.

F. B. FOGG AND H. H. HARRISON for Hamilton.

JNO. S. BRIEN for King.

JNO. C. GAUT for White.

MCFARLAND, J., delivered the opinion of the Court.

In the year 1862, Alexander Kennedy and Wm. White, citizens of East Tennessee, purchased cotton in Alabama, and being unable to have it transported to their homes, they stored the same with Charles A. King, a citizen of Decatur, Alabama, White having 32 bales, and Kennedy 25. It was stored in King's warehouse, at Decatur, with other cotton belonging to King himself. At the time the Confederate military were in possession of the town of Decatur, but the town was afterwards occupied by the Federal military. The cotton was used by both armies for the purposes of fortifications, but was afterwards returned by King to his warehouse. After the occupation of Decatur by the Federal military, Charles A. King was, by the com-

manding General, ordered to the rear of his lines. The order was obeyed, King removing with his family to Tennessee. He was allowed to remove with him ten bales of his cotton, but the balance was left. About April, 1864, Gen. Veatch, commanding the United States forces at Decatur, notified Charles A. Fuller, special agent of the Treasury Department, that he had seized, or captured as abandoned, the cotton at Decatur, and requiring him to take possession of it. Fuller did so, and between that time and September, 1864, removed sixty bales and four bags to Nashville, and stored the same with the complainants, Hamilton & Co., commission merchants and warehousemen. It does not clearly appear what became of the balance of the cotton. White, Kennedy and King, by their agents, as well as in person, soon after appeared and demanded the cotton to be returned to them, These demands were several times repeated, but refused, Hamilton & Co. declining to surrender the cotton except upon the order of Fuller. This order Fuller declined to give. Application was also made to another agent of the Treasury Department, at Cincinnati, who appears to have been superior in authority to Fuller. He also declined to order the cotton surrendered, upon the ground, that, if it had been lawfully seized, it was the duty of the agent to transport it to a loyal State and sell it, and pay the proceeds into the United States Treasury, and leave the owners to prosecute their claims for the money in accordance with the Act of Congress of 12th of March, 1863. It appears,

also, that the complainants applied to the Treasury Department for pay for the cotton, which was refused. This refusal might well have been placed upon the ground that the proceeds of the cotton had never been paid into the Treasury.

It appears that the cotton, before its removal from Decatur, had been so badly used as to destroy the marks by which it could be identified, and, as to part, had to be rebaled or put in bags. It sufficiently appears that the sixty bales and four bags belonged to Kennedy, King and White, but what bales, or what part to each, does not appear, nor did they know at the time their demands were made. It appears, however, that in some of their interviews, they proposed to settle this among themselves, if the cotton was surrendered to them. The claimants of the cotton were shown to be loyal to the United States Government. About the 7th of November, 1864, King brought an action of replevin, in the Circuit Court of Nashville, for thirty-eight bales of the cotton. The process was returned executed, but, in fact, the cotton was not taken out of the possession of Hamilton & Co., and we do not understand that Hamilton & Co. held these thirty-eight bales for King, from this time, for they still refused to surrender it to him. Fuller, thereupon, filed a petition or bill in the Circuit Court of the United States at Nashville. This petition or bill is not in this record, but it is agreed that it alleged in substance, that he had lawfully seized the cotton as special agent of the Treasury Department, but had

failed to forward, because it was claimed not to be "abandoned property," stated the conflicting claims of White, King and Kennedy, who were made parties, and called upon to interplead as to its ownership. White, Kennedy and King, or his administrator, answered the petition, claiming the cotton, but differed among themselves as to its ownership. About the 3rd of May, 1866, White, Kennedy, and the administrator of King, who had in the meantime died, agreed, in writing, upon a division of the cotton.

This was submitted to Fuller, and he was requested to dismiss the suit and surrender the cotton. This was again refused, except upon conditions that said claimants declined to accept. These conditions were, that they should pay all the costs, the claims of Hamilton & Co., and release Fuller from all further liability on account of the seizure. A decree was afterwards made by consent, under which the cotton was sold by the Clerk of the Court, the proceeds, amounting to $5,730, to be held subject to further order. The price had, in the meantime, declined very greatly. This decree for the sale of the cotton, contains, in addition, the following: "And because it is suggested by the claimants of said lot of cotton, that A. Hamilton & Co. have charges for storage and insurance upon said lot of cotton, which are believed to be unjust, it is ordered by the Court, that A. Hamilton & Co. file their account, etc., giving to each party the right to take proof, and the Clerk to report upon it."

On the 13th of December, 1866, the Clerk reported

A. Hamilton & Co. *v.* Allen Kennedy, *et als.*

in favor of the claim of Hamilton & Co. for $3,525.31. This report was excepted to. The cause was heard on the 7th of April, 1867. The substance of the decree was, that the Court had no jurisdiction to remove or take cognizance of the action of replevin, or to take cognizance of the case as a bill of interpleader. The petition was thereupon dismissed, the replevin suit remanded to the Circuit Court of Davidson county, and Fuller adjudged to pay the costs up to the filing of defendant's answer; the balance of the costs to be paid out of the sale of the cotton. The decree then contains the following: "And because it was admitted by the counsel in the cause, that neither the United States nor the said C. A. Fuller, have any interest in the cotton sold by the order heretofore made in the cause, except so far as they may be interested in having said account of A. Hamilton & Co. paid, and the said White, King and Kennedy having agreed among themselves upon a division," etc., the money was ordered to be paid to them, but the order was not intended to affect any lien acquired upon the cotton previous thereto.

The claim of Hamilton not having been acted upon in this decree, they immediately thereafter filed this bill and impounded the fund, or a sufficient part of it to pay their claim. There was judgment *pro confesso* against King, but White and Kennedy resisted the claim, and have appealed from the decree against them. The facts upon which the claim rests have been substantially stated.

The Act of Congress of the 12th of March, 1863,

31—vol. 3.

provides for the appointment of special agents of the Treasury Department to collect all abandoned or captured property in the States in insurrection. These agents were invested with the power to sell the property in a loyal State, pay the proceeds into the United States Treasury, and the owner was allowed, if loyal, to prosecute his claim for the money before the Court of Claims at any time within two years from the termination of the rebellion. It was under this law that Fuller was appointed and acting.

The sixth Section of the Act made it the duty of the officers and soldiers of the army taking or having any such abandoned property, or cotton, sugar, rice or tobacco, to turn the same over to said special agent, and take his receipt for the same. If it was material or proper for us to enquire, we should be of opinion that the cotton in question was not "abandoned" in the sense of the Act at the time of its seizure, as White and Kennedy insist in their answers; but be this as it may, it is well settled that during the war cotton in the hands of private parties in the rebel States was the subject of capture by the United States forces as enemies property, without regard to the question whether the owner was in fact loyal or disloyal. Mrs. Alexander's cotton, 2 Wallace, p. 404.

It is true, that exceptions were made to this rule in places permanently held by the Federal authority; in such cases it is said to have been the general policy of the Government to protect private property from seizure. This rule, however, was subject to modifica-

tion by the Government or commanding General. See
The Venice, 2 Wallace; *United States* v. *Paddleford*, 9
Wallace, 531. It clearly appears, and is in fact admit-
ted, that the cotton in question was seized by General
Veatch, either as abandoned or captured, and while it
appears that Decatur was held from that time until the
close of the war by the United States military, we can
not say that the seizure was so contrary to the usages
of war, or the policy of the Government as to make the
seizure absolutely unauthorized. It will be observed
that under this Act it was lawful for the special agent
to take charge of property not coming strictly under the
head of abandoned property under ·the meaning of the
Act. He was also required to receive cotton, rice, to-
bacco, etc., which might come to the hands of the offic-
ers as captured. It will also be observed that seizures
of this character did not necessarily imply confiscation,
as a remedy was afforded the loyal owner by which he
might recover the proceeds of the sale of his property.
This course might in some cases prove of great advan-
tage to the owner by saving to him the proceeds of
property which might otherwise be lost.

We are of opinion that the possession of Fuller in
the first instance was authorized, and had he pursued
the regular course of his duty in such cases by selling
the cotton, and paying the proceeds into the United
States Treasury, the only remedy of the owners would
have been by applying to the Court of Claims, in which
case they might have received the net proceeds after de-
ducting expenses. But the difficulty here arises from

the fact, that Fuller would neither surrender the cotton to the claimants nor forward it to be sold under the Act of Congress.

It appears, from what is admitted to have been the allegations of his petition in the United States Circuit Court, that the reason he did not forward it to be sold was because the cotton was claimed by the defendants to belong to them and not to have been abandoned. We suppose that whenever Fuller became satisfied that the cotton belonged to the defendants, and that they were loyal, he might lawfully have surrendered it to them—at any rate, he seems to have acted upon this assumption. If, however, he did not choose to adopt this course, we do not say that the State Court would have had jurisdiction to compel its surrender, inasmuch as the cotton had been seized by a commanding General, and turned over to him as captured. So long, therefore, as he choose to retain it in behalf of the Government, his possession must be regarded as authorized. We understand, however, that when he filed his petition in the United States Circuit Court, he did so not for the purpose of enforcing any claim of the Government against the cotton, but in the nature of a bill of interpleader, to settle the conflicting claims of the defendants. This is, in substance, the statement of his counsel, who was also United States attorney. No proof was taken upon the part of the Government. There is proof that in 1864, soon after the seizure, the defendants proposed to agree upon a division among themselves if the cotton were

surrendered to them. We do not understand that Fuller retained possession or control pending the litigation, by consent either express or implied, and about the 6th of May, 1866, the claimants agreed in writing upon a division. Fuller had notice of this. The parties then agreed to pay the costs and accept the cotton if surrendered to them. This was refused, although it is apparent that Fuller no longer claimed to hold for the Government. We hold that so long as Fuller claimed in good faith to hold the cotton for the Government, his possession was rightful; but when he abandoned that claim, he should have surrendered the cotton to the parties from whom it was taken. We understand that the claim of the Government was abandoned upon the filing of the petition in the United States Court. He says he did not forward the cotton because it was claimed by the defendants not to have been abandoned; his counsel says if he regarded it as a bill of interpleader, no proof was taken upon the part of the Government, and it was admitted on the hearing that neither the Government nor Fuller had any claim. The conflict between the defendants as to the ownership was no sufficient excuse for not surrendering the cotton, as they agreed to settle it among themselves. Besides, as the cotton was taken from King, a surrender of it back to him would have released Fuller from further liability. We hold his possession to this date, the filing of the petition in the United States Court, was justifiable, and that the charges properly accruing up to that date constituted

a lien upon the cotton. But all charges accruing after that date we hold do not constitute a lien. There are cases when the bailee or warehouseman may have a lien upon the property, although held contrary to the will of the true owners.

These cases, we think, will be found to rest upon the principle that the services or charges had to be rendered by some one, and that they have enured to the benefit of the true owner; but such we think is not this case, for the wrongful withdrawal of the defendants' property has resulted in great loss to them, and they were all the time insisting upon the property being restored to them, and of this the complainants had full notice. In such cases we think the bailee or warehouseman can stand in no higher attitude than the party under whom he holds, and must look to him for services rendered at his instance, and which have not enured to the benefit of the true owner. See 3 Parsons on Con., 268 and notes; 2 Wendell, 275.

As to that part of the money belonging to King, the decree below will not be disturbed, as he has not appealed; as to the part of White and Kennedy, the decree will be modified as indicated, and an account taken to ascertain the proper charges due from them to the complainants on this basis. The costs of this Court will be paid by the complainants.